UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex. rel.*
BEN BANE,

                Plaintiff,

v.                                       Case No. 8:06-CV-40-T-24MAP

BREATHE EASY PULMONARY
SERVICES, INC.; PREMIER CARDIO
PULMONARY MEDICAL, INC., LINCARE
HOLDINGS INC., and LINCARE, INC.

                Defendants.
_____/

## REPORT AND RECOMMENDATION

In this *qui tam* action, the Relator (Bane) seeks to recover damages and civil penalties against

the providers of oxygen services (Lincare) and pulmonary testing (Breathe Easy) under the Federal

Civil False Claims Act (FCA). *See* 31 U.S.C. § 3729 *et seq.* Both Lincare and Breathe Easy have

moved to dismiss the second amended complaint contending it fails to meet Fed. R. Civ. P. 9(b)'s

particularity requirements for pleading fraud and otherwise fails to state a cause of action (docs. 38,

39). For the reasons set forth below, I recommend their motions to dismiss be denied.[1]

*A. Perspectives*

The Federal Rules of Civil Procedure generally do not require a plaintiff to set out in detail

the facts upon which he bases his claim. Instead, all that ordinarily is required is that the claimant

set forth a "short and plain statement of his claim showing that the pleader is entitled to relief" in

_____

[1] The district judge referred these motions to me for a report and recommendation
pursuant to 28 U.S.C. § 636 (doc. 40).

order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Hence, while a plaintiff attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, he is obliged to provide the "grounds" of his "entitlement to relief," more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964-65 (2007). "Factual allegations must be enough to raise [the claimant's] right to relief above the speculative label on the assumption that all of the complaint's allegations are true." *Id.* at 1965 (citations omitted). Moreover, all reasonable inferences are construed in the light most favorable to the claimant. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

Claims of fraud present an exception to Rule 8's "notice" pleading protocol. Per Rule 9(b), which applies to False Claim Act cases, "the circumstances constituting fraud … shall be stated with particularity." *See United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1308-1309 (11th Cir. 2002) (making "clear that Rule 9(b) applies to all False Claim Act actions"). This rule prevents "speculative suits against innocent actors for fraud" and requires allegations "include facts as to time, place, and substance of the defendant's alleged fraud" thereby preventing "guilt by association" tactics. *Id.* quoting *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla.,* 19 F.3d 562, 566-67 (11th Cir. 1994). Because a central question in a False Claims Act case is whether the defendant presented a "false or fraudulent" claim to the government, to be actionable as a violation a relator must do more than set out the defendant's practices which were unwise or improper. Not only does the rule require the relator plead the circumstances of the fraud with particularity, he must further set out with some indicia of reliability that the defendant

submitted or caused to be submitted an actual false claim for payment to the government. *Id.* at 1311 (finding relator's descriptions of defendant's alleged schemes to increase its testing and revenues accompanied by dozens of pages of exhibits failed to include any factual basis for conclusory statement that defendant submitted bills to the government and holding that such failure to allege with any specificity if or when any actual improper claims were submitted to the government was fatal to his complaints).

A relator in a *qui tam* action, whether a corporate insider or an outsider, must satisfy Rule 9(b): "[w]hile an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the False Claims Act, neither the Federal Rules nor the Act offer any special leniency under these particular circumstances to justify [the relator] failing to allege with the required specificity the circumstances of the fraudulent conduct he asserts in his action." *Clausen*, 290 F.3d at 1314.[2] As the *Clausen* court noted, while the application of Rule 9(b) must not abrogate the concept of notice pleading, to satisfy 9(b)'s demands the complaint must set forth (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud. *Clausen*, 290 F.3d at 1310 citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202

---

[2] Even the author recognized as "the leading commentator in the field" by the Eleventh Circuit agrees: "It is widely accepted by courts that because the essence of a False Claims Act case is fraud, Rule 9(b) applies to [False Claims Act] cases. As a result, plaintiffs in [False Claims Act] cases, whether the government, *qui tam* relator, or both, must make far more detailed allegations in [False Claims Act] complaints than in most litigation." *See* John T. Boese, *Civil False Claims and Qui Tam Actions* § 5.04 (2d ed 2000 & Supp. 2002).

(11th Cir. 2001) (quotations omitted).  "[T]he whistle must be blown not only loudly, but with Rule 9(b) particularity in the complaint before the courts will listen."  *United States ex rel. Adkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006).

    *B.  Second Amended Complaint*

       *1.  context*

This case concerns the communication among physicians, oxygen providers, and pulmonary testing services in the delivery of oxygen to Medicare eligible patients, that population most in need of such treatment.  Each plays an important and independent role under the health care scheme: the physician, concluding his or her patient needs oxygen, contacts a provider of oxygen services; because Medicare requires the patient to meet certain minimal guidelines to qualify for such services, the oxygen provider refers the patient to a laboratory for testing; the laboratory, which by Medicare rules must be independent of the oxygen provider, administers a pulse oximetry test to determine if the patient qualifies for oxygen under Medicare's guidelines; and at some point during this process, the physician signs an authorization, essentially a script, for the oximetry test thereby documenting the procedure as medically necessary, a prerequisite for appropriately billing Medicare.[3]

This process, presumably, ensures the patient is only provided at Medicare's expense with the services the physician deems medically necessary.  Here, however, the contention is that Lincare, as the oxygen provider, schemed with the Breathe Easy, the laboratory, to circumvent the

---

    [3] The pulse oximetry test is a simple procedure that measures the patient's oxygen saturation of the arterial blood by using a device that passes two light waves through a patient's skin to sense the infrared and red light absorption properties of deoxygenated and oxygenated hemoglobin.

Medicare framework and bill Medicare for unnecessary clinical evaluations.  Such procedures were unnecessary because, according to Bane, the physician had already evaluated the patient, would not have ordered another evaluation, and were bundled as a matter of course with the one medically necessary test the physician did request – the pulse oximetry.  The scheme, posits Bane, benefitted Lincare and Breathe Easy (hence the kickbacks).  For Breathe Easy, bundling made administering a pulse oximetry test economically feasible and attractive.  For Lincare, it insured Breathe Easy's quick visit to the patient's home, thereby allowing Lincare's correspondingly rapid delivery of oxygen to the patient and the billing of Medicare for the oxygen.[4]

With this context in mind, the Court's task here is straightforward: examine Bane's second amended complaint and look for *Clausen's* pleading demands using a specific perspective: that his allegations are true; that those allegations are entitled to their reasonable inferences; and that such logical inferences are to be construed in the light most favorable to Bane.  *Bryant, supra* at 187 F.3d 1273 n.1 (11th Cir. 1999).  Per *Clausen,* Bane must plead "'facts as to time, place, and substance" of the alleged fraud with specificity as to "the details of [Lincare's and Breathe Easy's] allegedly fraudulent acts, when they occurred, and who engaged in them."  *Clausen,* 290 F.3d at 1310, quoting *Cooper, supra* at 19 F.3d 567-68.  Moreover, Bane must with "some indicia of reliability" support his allegation that "*an actual false claim* for payment" was made to the government.  *Id.* at 1311 (emphasis in the original).

---

[4] The fraudulent "bundling" of laboratory tests, as  mixing unnecessary ones with reasonably necessary tests, has been the subject of criminal prosecutions and *qui tam* actions under the False Claims Act.  *See United States v. Thurston,* 358 F.3d 51, 54 (1st Cir. 2004) (affirming conspiracy to defraud Medicare), *judgment vacated*, 543 U.S. 1097 (2005) (sentencing guideline issues) ; *United States ex rel. Merena v. SmithKline Beecham Corp.,* 205 F.3d 97, 98-99 (3d Cir. 2000); *United States v. Shaw,* 113 F. Supp. 2d 152, 157 (D. Mass. 2000) (mail fraud and conspiracy to defraud Medicare and Anti-Kickback Act).

### 2. Bane's allegations

### a. his sources

Bane has worked in this industry for over twenty-five years and has extensive experience in providing in-home oxygen and respiratory therapy services to Medicare-eligible patients. Indeed, he has owned two durable medical equipment businesses. Both offered oxygen services, and, notably, he sold both to Lincare, one of the nation's largest providers of oxygen and other respiratory therapy services to patients in the home.[5] Bane in 1995 sold his first business, which he started in 1981, to Lincare. Afterward, he remained in the industry working for a competitor to Lincare. In March of 2000, Bane started another durable equipment business that competed with Lincare (Bane Medical Services, Inc. referred to here as BMS). Around late 2004, he sold BMS to Lincare.[6]

Throughout his participation in the industry, Bane, like Lincare, dealt with providers of pulse oximetry testing in order to qualify his customers for Medicare reimbursement. Consequently, he knew about Breathe Easy, a Clearwater-based laboratory that did pulse oximetry

---

[5]  Lincare serves over 530,000 customers in 47 states through 804 operating centers. Defendant Lincare Holdings, Inc. is a Delaware corporation headquartered in Clearwater, Florida. Together with its subsidiary Defendant Lincare, Inc., they are collectively referred to here as Lincare.

[6]  Although the second amended complaint does not specifically say when Bane sold BMS to Lincare, it reasonable to infer that it occurred before January 14, 2005. Bane states that in late 2004, he began negotiating with Lincare about the sale of BMS (doc. 35 at ¶ 19.). He adds that former BMS employees worked for Lincare "after the sale" and that *Lincare* "serviced" ex-BMS patients. *Id.* at ¶23. On January 14, 2005, Tessa Belfy, *a Lincare employee*, filled out a Breathe Easy O2 Assessment Referral Form regarding Carolyn Watts and sent it to Watts's physician. That form notes the durable medical equipment company as BMS. *See* doc. 35, ¶¶ 36, 36, doc. 37, exhibit 4.

testing.[7]  Whether he referred his customers to Breathe Easy for testing, however, is unclear from the complaint.  Although he omits stating he specifically referred his customers to Breathe Easy, he alleges he "engaged in discussions" with that Clearwater-based firm about testing (doc. 35 at ¶ 16).  From these discussions, as well as his observations over the years as owner of BMS, Bane learned that Lincare sent many of its Medicare patients to Breathe Easy for testing.

Based on his experience, his observations from operating BMS, his due diligence in preparing to sell BMS to Lincare, and his discussions with three corporate insiders at Lincare (Phil Phenis, national reimbursement manager; Lori DeMello, vice president; and Lori Miller, billing department), Bane questioned Lincare's referral relationship with Breathe Easy.  On his own initiative, he investigated the matter further by contacting physicians, ex-Lincare employees, former BMS employees who worked for Lincare after the sale, and his former patients who were now serviced by Lincare.  From all this, he claims he has direct and independent knowledge of "the allegations set forth" in his complaint.  *See* doc. 35 ¶¶ 19-24.  Admittedly, Bane does not claim to be a corporate insider to Lincare or Breathe Easy; nonetheless, his vantage was that of an interested and observant outsider with knowledgeable ties to insider processes.

### b. the scheme

In a nutshell, Bane describes this scheme, which he asserts has been ongoing since at least 2000:  physicians, concluding a Medicare patient needed oxygen services, called Lincare to arrange for overnight pulse oximetry testing and oxygen services; Lincare, "in furtherance of a conspiratorial agreement," referred this testing to firms like Breathe Easy;  Lincare's referral also asked for

---

[7]  Breathe Easy is owned by Defendant Premier.  Both have the same president and owner, and both apparently operate at the same location.  As in the complaint, both are collectively are referred to here as Breathe Easy.  *See* doc. 35, ¶ 10.

Breathe Easy to perform other tests which the physician had not initially requested; Breathe Easy

billed Medicare for the oximetry tests and the additional services; Lincare delivered the oximetry

referral form to the doctors and instructed the doctors to sign the forms; after receiving the doctor's

signature, Lincare forwarded the form to Breathe Easy; and Breathe Easy submitted its claim to

Medicare for the unnecessary clinical evaluation.  *See* doc. 35,  ¶¶ 27- 32.[8]   To support his

assertions that physicians did not authorize additional services, Bane adds: the  physicians "who

signed these referral forms, such as Dr. Christopher Bechelmann, Dr. Steve Smith, Dr. Howard

Diener, and Dr. John Swisher, believed these forms authorized only a pulse oximetry test.  They did

not know that each time he or she filled out the form, Lincare was arranging for Breathe Easy, Life

Care or another oximetry testing company, to perform on the patient, not only a pulse oximetry test,

but also an additional service ..."  *Id.*, ¶ 28.  These doctors "consider these additional services to be

medically  unnecessary  and  redundant  because  (1)  the  physicians  already  perform  their  own

evaluations  and  assessments  of  their  patients  before  contacting  Lincare  about  obtaining   home

oxygen services, and (2) they were not provided reports of the results of these additional services."

*Id.,* ¶ 29.

    *C.  Discussion*

        *1.  Rule 9(b)*

---

   [8]  Bane names seven other oximetry companies as Lincare's co-conspirators: Life Care
Diagnostics, N2Air of Louisville, Kentucky, B&M Oximetry Lab, Inc. of Plantation, Florida,
Healthy Choice of Memphis, Tennessee, Respiratory Outreach of Chico/ Sacramento, California,
Oximetry Trendy of Toledo, Ohio, and Peterson Oximetry of Southern California (doc. 35, ¶ 27).
None are parties to this action; however, Bane as relator has brought a separate, but similar, *qui
tam* action in this division against Lincare and Life Care Diagnostics.  *See United States ex rel.
Ben Bane v. Lincare Holdings*, et al., Case No. 8:06-cv-467-T-30EAJ.  I find none of these
allegations, even those about Life Care Diagnostics, particularly relevant here, and I have not
considered them as have any application to the issues raised in the motions to dismiss.

Lincare and Breathe Easy take roughly the same tack in arguing for dismissal: Bane fails to meet Rule 9(b)'s particularity requirements as his allegations are conclusory and too vague; he fails to present with any "indicia of reliability" that Breathe Easy actually submitted a false claim to Medicare or that Lincare caused such a claim to be submitted; his "typical example" of a false claim fails because there is insufficient proof it was false; lastly, he fails to state claims for conspiracy and anti-kickback violations.   In asserting these arguments, both urge this case is similar to a previous unsuccessful *qui tam* action against Lincare where the circuit affirmed the district judge's dismissal of the complaint under Rule 9(b).  *See Corsello v. Lincare,* 428 F.3d 1008 (11th Cir. 2005).   Bane, on the other hand, argues Lincare and Breathe Easy apply *Clausen* and its progeny incorrectly and misleadingly and his complaint satisfies Rule 9(b)'s demands.

Having carefully considered Bane's complaint, I conclude it meets Rule 9(b)'s threshold requirements: the what, the who, and the when of the fraudulent scheme.   As to the who and the what, Bane names physicians who called Lincare to order overnight pulse oximetry tests (doc. 35 at ¶¶ 27, 28, 29).   He alleges with specificity that these physicians did not order additional tests and particularly did not order their patients undergo a clinical evaluation, which they viewed as unnecessary because they routinely evaluated patients before making referrals.   He identifies the specific referral form Breathe Easy and Lincare used to carry out the scheme.   This form called for Breathe Easy to automatically perform tests that the physician did not order initially and only later approved unwittingly.   Bane also names the specific Lincare managers (Regional Vice President Lori DiMello and Stephanie Wood) who instructed Lincare sales representatives and managers not to disclose this to the referring physicians (doc. 35, ¶ 29).   For each unnecessary clinical evaluation, Breathe Easy billed the government about $115 in addition to the approximate

$17 cost for the one medically necessary test, the pulse oximetry (doc. 35, ¶¶ 31, 32).  Lastly, as to the when, Bane dates the scheme – from 2000 to the filing of complaint (doc. 35, ¶32).

Yet, if Bane had stopped here, his complaint would not satisfy *Clausen's* "directive" for pleading with some "indicia of reliability" that Breathe Easy and Lincare filed or caused to be filed "*an actual false claim*" to the government.  *Clausen,* 290 F.3d at 1311.  This is particularly so given his lack of insider status within either Lincare or Breathe Easy.  *Clausen*, 290 F.3d at 1314 (distinguishing corporate insider from corporate outsider).  Recognizing this, Bane supports his particular allegations with a specific false claim and its attendant documentation, the Watts claim (doc. 37, exhibits 4-6).[9]  In short, Bane does what the circuit criticized the relator in *Clausen* for not doing – provide proof that a particular false claim was filed with the government.  *Clausen,* 290 F.3d at 1312 ("No copy of a single bill or payment was provided.").

To corroborate his allegations, Bane attaches to his complaint the "O2 Assessment Referral Form."  This single-page, standardized form, with Breathe Easy's letterhead atop, included authorizing language – "O2 assessment Referral (Includes: overnight oximetry, rest & exercises oximetry and clinical evaluation)" – and a pre-marked "X" at the bottom of the form.  *See* doc. 37, exhibits 4 (Watts), 7B, 7C, 7D.[10]  The form memorialized the physician's approval for the bundled tests at two different times: (1) at the initial telephonic contact with Lincare, the form's pre-marked "X" confirmed the physician's verbal authorization; and (2) after Breathe Easy had

---

[9]  Lincare and Breathe Easy, inferentially if not directly, recognize that a relator may use an example to satisfy the requisite indicia of reliability that the scheme reached fruition. *Clausen,* 290 F.3d 1312.

[10]  As Bane's counsel observed at the hearing, these words are smaller and less conspicuous when compared to the other parts of the form memorializing a physician's request that a specific procedure be done.

evaluated and tested the patient, the physician's signed authorization below the pre-marked "X." Thus, the form assured that every physician, irrespective of his or her verbal order for a pulse oximetry test and nothing else, approved the bundled tests. Not only did the pre-marked "X" automatically evidence the physician's verbal authorization for the bundled tests and their medical necessity, it inferred that *every* physician who called Lincare for oxygen services verbally ordered without fail *the exact same tests* in the bundled package. Accordingly, each form provided Breathe Easy cover to bill Medicare for a clinical evaluation. Only the patients' names, their physicians, and the dates changed. Faced with Watts's documentation, Breathe Easy and Lincare argue it nonetheless fails to demonstrate fraud, and Bane's proof is remarkably similar to what the circuit rejected in *Corsello.* Neither position is persuasive.

Like Bane, the relators in *Clausen* and *Corsello* were corporate outsiders. Unlike Bane, neither offered reliable indicia to support their allegations that fraudulent claims were submitted to the government. To quote the panel in *Corsello,* "[a]t best, Corsello alleged that improper practices have 'resulted in the submission of fraudulent claims,' or 'lead directly to the submission of fraudulent claims." 428 F.3d at 1013. The court, confronted with Corsello's allegations that improperly completed Medicare forms "resulted in the submission of fraudulent claims," refused to make the inferred leap that the defendants submitted actual false claims. *Id.* This "assumption would 'strip[ ] all meaning from Rule 9(b)'s requirement of specificity.'" *Id.* citing *Clausen,* 290 F.3d at 1312 n. 21. Bane, in contrast to *Corsello,* included Medicare's explanation of benefits to Watts which itemized Breathe Easy's claim and Medicare's corresponding payment. This document, when reviewed and compared with her related documents, reliably supports the conclusion that Breathe Easy actually submitted a false claim and that Lincare caused such a claim

to be submitted per the scheme.

Lincare and Breathe Easy's argument that Bane has not offered reliable indicia of fraud also misses the mark. First, confronted with the Watts exhibits, neither Lincare nor Breathe Easy argues that Bane has failed to present proof of an actual claim being made to the government, something that the *Clausen* and *Corsello* relators omitted and the circuit repeatedly highlighted. Namely, neither Lincare or Breathe Easy disputes what Banes's "typical example" clearly shows: a claim in the amount of $198.00 to the government by Breathe Easy for services Breathe Easy's practitioner, Melanie Johnson, rendered to Carolyn Watts on January 17, 2005. Nor do they dispute that these services were for a clinical evaluation and pulse oximetry; or that Medicare processed the claim on March 14, 2005; and that the government paid Breathe Easy $115.82 (*see* doc. 37, exhibit 6, i.e., explanation of benefits mailed to Watts; compare to exhibit 5, "respiratory clinical evaluation" by Breathe Easy). Instead, faced with reliable evidence that Breathe Easy filed the claim, Breathe Easy and Lincare argue that Bane has not shown Watts's claim was fraudulent. In short, they parse out the claim, look at it in isolation, ignore Bane's other allegations in the complaint about the scheme, and fail to acknowledge the attendant reasonable inferences favorable to Bane.

Bane's essential thrust – Watts's claim reliably typifies the fraudulent billing scheme – is far more convincing than Lincare and Breathe Easy's counter argument: Watts's physician, as evidenced by his signature, knowingly approved the tests; besides, Bane has failed to prove otherwise. This counter argument necessarily presumes that Watts's doctor knew about the bundled tests when he spoke to Lincare's employee on January 14, 2005, and that he specifically asked that Breathe Easy perform all. These inferences, particularly against Bane's allegations that

several named physicians were unaware of the bundling, are just unreasonable.  Lincare and

Breathe Easy's argument also avoids other inferences, all unreasonable, flowing from the form's

rote application.  To accept Breathe Easy and Lincare's position would mean that every physician

verbally ordered a clinical evaluation for every patient referred to Lincare and tested by Breathe

Easy, that every physician determined this exam to be medically necessary even though he had

already decided his patient needed oxygen, and that every physician who signed the form knew

he had the option of unbundling the screening tests but chose otherwise.[11]

Examining Watts's exhibits for clues of fraud without considering Bane's surrounding

allegations encourages two analytical mistakes.  First, that approach blindly promotes the O2

referral form's devious purpose, at least as Bane reasonably proposes – to give Breathe Easy

regulatory cover that bundled tests were medically necessary.  Namely, because the physician

signed the form, he must have necessarily concluded a clinical evaluation was medically

necessary.  Hence, Watts's claim, like all others using O2 form, was appropriately submitted to

Medicare.  Besides, Bane, according to Breathe Easy and Lincare, has not shown Watts's

physician acted otherwise.  That approach, for the reasons already stated, avoids the force of

Banes's allegations.  Lastly, to evaluate Watts's claim as Breathe Easy and Lincare suggest

_____

[11] The scheme Bane describes is similar to that in *Thurston, supra* at note 4.  There, the defendants bundled a blood test (ferritin) ordered by doctors less than two percent of the time with a panel of blood test (LabScan) ordered up to forty percent of the time.  The physicians were not told that Medicare paid for the ferritin tests, or that they could order a specific test only, and nothing in the medical literature suggested that test to be medically necessary as an adjunct to a LabScan test.  *Id.* at 358 F.3d 54, 57.  The defendants were convicted of "conspiracy to defraud the United States by inducing physicians through deceit and trickery into certifying tests as medically necessary when the ferritin tests were not necessary, thus leading Medicare to pay for unnecessary services."  *Id.* at 65; *see* 18 U.S.C. § 371.  Notably, the defendant who went to trial unsuccessfully asserted the defense that he committed no fraud because it was the physicians who certified the tests as necessary, not he.  *Id.*

counters Rule 9(b)'s purpose, which is to "alert[ ] defendants to the precise misconduct with which

they are charged and protect[ ] defendants against the spurious charges of immoral and fraudulent

behavior." *Hill v. Morehouse Medical Associates, Inc.,* 2003 WL 22019936, *3 (11th Cir. 2003)

quoting *Ziemba v. Cascade Int'l,* 256 F.3d 1194, 1202 (11th Cir. 2001).   Bane has alerted the

Defendants as to their precise misconduct – the routine use of the O2 referral form to deceive

physicians into authorizing medically unnecessary tests thereby supporting a fraudulent scheme

to bill Medicare.   Reading Bane's typical example with the remainder of his complaint satisfies

Rule 9(b) notice demands.

### 2. *Lincare's role – causing claims to be filed*

Lincare argues Bane fails to connect it to conduct prohibited by the False Claims Act.   *See*

doc. 38, p. 7.   But as Bane explains, the False Claims Act punishes parties submitting false claims

and the parties who cause false claims to be submitted.   *See generally United States ex rel. Marcus*

*v. Hess*, 317 U.S. 537, 544 (1943) (holding that the "causing to be presented" and conspiracy

provisions of the False Claims Act "considered together, indicate a purpose to reach any person who

knowingly assisted in causing the government to pay claims which were grounded in fraud, without

regard to whether that person had direct contractual relations with the government."); *United States*

*ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (concluding that

relator's allegations that the defendants assisted one another and cooperated in a scheme or pattern

of billing for and covering up allegedly false-claim items sufficed to implicate all named defendants

regardless of whether they were ones who actually submitted the claim forms); *United States v.*

*Mackby*, 261 F.3d 821, 827 (9th Cir. 2001).   Bane specifically describes that Lincare "cause[d]"

Breathe Easy to submit false claims by providing physicians with Breathe Easy's O2 Assessment

Referral Forms with the knowledge that even though the physicians only want pulse oximetry tests performed, the forms specify that additional services are ordered (doc. 35, ¶¶ 27-30). Bane adds that Lincare is aware that the additional services are not medically necessary and should not be submitted for payment to Medicare.  In light of *Hess*, *supra,* I find Bane's allegations concerning Lincare, taken with his complaint as a whole, are sufficient and meet Rule 9's requirements.

Additionally, Bane need not show that Lincare authorized, instructed, delegated, or directly benefitted from Breathe Easy's claims to Medicare.  The False Claims Act does not require a direct order to present a false claim.  Nor does the Act require a party who causes false claims to be presented to gain or benefit from the fraud.  *See generally Hess*, *supra*;  *United States ex rel. Sikkenga v. Regence Blue Cross Blue Shield of Utah*, 472 F.3d 702, n. 17 (10th Cir. 2006) ("there is no support for the defendant's position that a causing to be presented claim requires a direct order to present a false claim."); *United States ex rel. Doe v. DeGregorio*, 510 F.Supp. 2d 877 (M.D. Fla. 2007) (finding defendant's argument that he did not benefit from the submission of false claims had "no bearing" as "direct personal benefits" are not required in a False Claims Act cause of action). In any event, Bane alleges that Lincare in fact benefitted from the fraudulent scheme because in return for causing Breathe Easy's submission of false claims for medically unnecessary additional medical services, Lincare received oximetry testing needed to qualify patients for Medicare-paid oxygen. *See* doc. 35, ¶ 58.

### 3.  conspiracy

Lincare and Breathe Easy assert Bane's allegations fail to establish that they conspired in violation of 31 U.S.C. §3729(a)(3).  To state a claim under §3729(a)(3), a relator must show: (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the

United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim. *Corsello,* 428 F.3d 1014.  Bane satisfies these elements.  He alleges the agreement (doc. 35, ¶¶ 2, 27, and 59); the specific overt acts each conspirator committed (¶¶ 25-33); and the damages suffered as a result (¶¶ 32-33).  His conspiracy allegations, particularly given the analysis with respect to the underlying false claim allegations, are specific enough to fulfill Rule 9(b)'s requirements.  In sum, they provide more than bare, unsupported legal conclusions that an agreement existed.

> 4.  *kickbacks*

Lincare argues that Bane's Anti-Kickback Act claim (count II) fails to state a claim upon which relief may be granted.  Specifically, Lincare argues the claim fails to allege the requisite *quid pro quo* required by § 1320a-7b(2) because the only remuneration alleged was that the physicians signed the forms Lincare and Breathe Easy provided to them and there was no allegation that Breathe Easy or Premier referred or arranged to refer to Lincare in exchange for the physicians' signatures.  This section requires that a payor of the remuneration do so to "induce" the payee to either (a) "refer an individual" for the furnishing of services or "arrange" same, or (b) "purchase, lease, order" etc. any goods or services or "recommend" same.  The Anti Kickback Act, however, is broad in scope, and "criminalizes broker style arrangements" whereby one non-physician entity receives remuneration for placing business with another non-physician entity.  And, it is irrelevant that physicians may have made the initial decision to purchase certain testing services.  *See Modern Medical Laboratories, Inc. v. Smith-Kline Beecham Clinical Laboratories, Inc.*, 1994 WL 449281, *3 (N.D. Ill. 1994) (finding §1320a-7b(2) proscribes activity whereby one entity receives

remuneration for essentially taking the physician's "orders" for laboratory tests and arranging for another entity to perform the work).   Bane's allegations here survive a Fed.R.Civ.P. 12(b)(6) challenge.

*D.  Conclusion*

For the reasons set forth above, I find   Accordingly, it is hereby

RECOMMENDED:

1.  That Defendants' motions to dismiss Plaintiff's second amended complaint (docs. 38, 39) be DENIED.

IT IS SO REPORTED at Tampa, Florida, on November 30, 2007.


*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice.   28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*).


Copies furnished to:
Hon. Susan C. Bucklew
Counsel of Record